UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

BAILE-BAIREAD, LLC,
        Plaintiff,

       v.

MAGNUM LAND SERVICES,
LLC, et al.,
        Defendants.

CASE NO. 2:12-CV-00957
JUDGE EDMUND A. SARGUS, JR.
MAGISTRATE JUDGE MARK R. ABEL

## OPINION AND ORDER

This matter is before the Court for consideration of competing motions for summary judgment. Plaintiff Baile-Bairead, LLC ("Baile-Bairead") moves for summary judgment as to its Complaint and the two counterclaims of Belmont Resources, LLC ("Belmont"). Doc. 24. Belmont submits a cross-motion for summary judgment as to Baile-Bairead's Complaint and Count 1 of its counterclaims. Doc. 23. For the reasons below, the Court **GRANTS** Belmont's cross-motion for summary judgment and **DENIES** Baile-Bairead's motion for summary judgment.

## I. BACKGROUND

### A. Facts

The substantive facts underlying this matter are largely uncontested. The Plaintiff in this case is Baile-Bairead, a limited liability company that owns approximately 506 acres of real property in Washington County, Ohio. Doc. 24-15 ¶ 3. At the time of the facts underlying this dispute, Baile-Bairead had two members—David C. Barrett, Sr., who served as the managing member of Baile-Bairead, and his wife, Friedel L. Barrett (collectively "the Barretts"). *See* doc. 23-3 at 8. Each owned a fifty percent interest in Baile-Bairead. *Id.*

In September of 2006, Baile-Bairead entered into two oil and gas leases ("the leases") with Magnum Land Services, LLC ("Magnum"). Each lease applied to a different tract of Baile-Bairead's property in Washington County. Doc. 3 at 27, 31. The Barretts each acknowledged and signed the leases under the title of "Lessor." *See* doc. 23-1 at 4; doc. 23-2 at 4. The Barretts then each signed two orders of payment—on the lines below "Lessor/Grantor"—that Magnum issued prior to the actual payment. *See* doc. 23-5. Based on these orders of payment, Magnum made two checks out to "David C. Barrett and Friedel L. Barrett" for a total of $12,682.53 as consideration on the leases. Doc. 23-6. Magnum subsequently assigned the leases to Belmont and a copy of the assignment was filed with the Washington County Recorder on March 28, 2008. Doc. 23-4.

Save for the description of the tracts of land, the leases are identical. *See* doc. 3 at 27–34. The "Effective Date" of both leases was September 22, 2006. *Id.* at 27, 31. Both leases include identical "Term of Lease" clauses, which provide that each:

> Lease shall be in force for a primary term of 5 years from the Effective Date, and as long thereafter as oil or gas or other substances covered by this Lease are produced in paying quantities from the lease premises or from lands pooled with the lease premises, or this Lease is maintained in force pursuant to any of its other provisions.

Doc. 3 at 27 (Ex. C ¶ 2), 31 (Ex. D ¶ 2). Each lease also contains the same "option" clause, which gives the lessee the option to extend the lease:

> for an additional primary term of **5** years commencing on the date that the lease would have expired but for the extension. Lessee may exercise its option by paying or tendering to Lessor an extension payment of **$25.00** per acre for the land then covered by the extended lease, said bonus to be paid or tendered to Lessor in the same manner as provided in Paragraph numbered 4 hereof with regard to the payment of shut-in royalties. If Lessee exercises this option, the primary term of the lease shall be considered to be continuous, commencing on the date of the lease and continuing from that date to the end of the extended lease term. Lessee's option shall expire on the first to occur of the following: (a) the termination or expiration of this lease or (b) the second anniversary of the expiration of the primary term stated in Paragraph number 2 above.

2

*Id.* at 29 (Ex. C ¶ 19), 33 (Ex. D ¶ 19). This "Option" clause directs the lessee to Paragraph 4, which provides that the lessee "shall be obligated to pay or tender . . . an amount . . . to Lessor, or to the credit of Lessor at <u>Lessor[']s address above</u>." *Id.* at 27 (Ex. C ¶ 4), 31 (Ex. D ¶ 4).

The leases also contain two clauses that address a potential breach or failure to pay. One clause is labeled "Notices":

> Failure to pay or an error in paying any rental or other payment due Lessor shall not constitute a ground for forfeiture of this Lease and shall not affect Lessee's obligation to make a payment, but Lessee should not be considered in default on account of a failure or error until Lessor has first given Lessee written notice of the non-payment and Lessee shall have failed for a period of thirty (30) days after receipt of the notice to make a payment.

Doc. 3 at 28 (Ex. C ¶ 8), 32 (Ex. D ¶ 8). The other clause, labeled "Breach or Default," requires to the "Lessor [to] notify the Lessee in writing of the facts relied on as constituting a breach"; the lessee then has "sixty (60) days after receipt of that notice within which to meet or commence to meet all or any part of the breaches alleged by Lessor." Doc. 3 at 29 (Ex. C ¶ 15), 33 (Ex. D ¶ 15). This clause also explains that serving notice of the breach "shall be precedent to the bringing of any action by Lessor," meaning "no action shall be brought until the lapse of the sixty (60) days after service of the notice on Lessee." *Id.*

The leases were set to expire on September 22, 2011. It is undisputed that no oil or gas was produced in paying quantities from either leased property during the primary lease term, and that the lease could not be extended on those grounds. *See* doc. 3 ¶ 14; doc. 5 ¶ 14. However, Magnum sent a letter to the Barretts, dated September 14, 2011, expressing its desire to renew the leases for an additional five-year period. Doc. 3 at 36. Attached to Magnum's letter was consideration for the lease renewal, a $12,780.00 check made payable to "David C. and Friedel L. Barrett," dated September 13, 2011. *Id.* at 35. It is undisputed that Friedel L. Barrett received the letter. *Id.* The letter and payment had two problems in Baile-Bairead's eyes—by this time,

3

David C. Barrett, Sr. had died, doc. 24-8 (letter from David C. Barrett, Jr. to Belmont representatives noting that "David C. Barrett, Sr. died on April 27, 2007"); Magnum also sent the letter to 884 S. Barrett Rd. rather than the correct address of 844 S. Barrett Rd, doc. 24-15 ¶ 12.

By this point, David C. Barrett, Jr., David C. Barrett, Sr.'s son, served as the managing member of Baile-Bairead. Doc. 24-15 ¶ 1–2. He responded on September 26, 2011 by sending letters to both Magnum and Belmont. Doc. 24-6. The letters informed Magnum and Belmont that the oil and gas leases "have expired and been forfeited" in accordance with Ohio Revised Code § 5301.332 because "no drilling has occurred on the premises and there was no extension payment made to the named Lessor, Baile-Bairead LLC, on or before the September 22, 2011 deadline." *Id.* Belmont responded with an undated letter, which Baile-Bairead received on October 14, 2011, doc. 3 ¶ 26, stating, "the payment has properly been tendered and it is Belmont's position that the leases remain in effect," doc. 24-7. It further stated: "if you desire that checks be reissued to the LLC we will accommodate that request upon confirmation of the lessor's agreement that the leases remain in place." *Id.* Five days later, Baile-Bairead, through David Barrett, Jr., responded with another letter reiterating the position that the leases expired and had been forfeited. The letter maintained that "any attempt to extend the leases should have been addressed to Baile-Bairead LLC, the land owner" and not to the Barretts. Doc. 24-8. It also noted that David C. Barrett, Sr. had died on April 27, 2007, meaning that the check addressed to the Barretts for the lease extension could not be negotiated. *Id.* Baile-Bairead ended its letter with an offer to enter into negotiations to lease the property under new terms. *Id.*

On January 31, 2012, Baile-Bairead sent a letter and an Affidavit of Forfeiture to the Washington County Recorder. The letter requested that the Washington County Recorder make a note in the margins that the leases had been cancelled. Doc. 24-10. The Washington County

Recorder accordingly marked the leases as cancelled. *See* doc. 24-11; doc. 24-12. On May 17, 2012, Magnum filed with the Washington Country Recorder two separate Affidavits of Notice of Extension of Oil and Gas Lease, one for each lease. *See* doc. 24-13; doc. 24-14.

## B. Procedural Background

Baile-Bairead brought this action in October 2012 in the Washington County Court of Common Pleas. *See* doc. 3. Belmont then removed the case to this Court on the basis of diversity jurisdiction. *See* doc. 1. Baile-Bairead asserts the following claims against Magnum and Belmont: (1) a claim for declaratory judgment that Baile-Bairead is the true and lawful owner of the mineral interest described in the two leases; (2) a claim that Baile-Bairead's title to the property and interests in the leases be quieted against any claim or interest of the Defendants; (3) and an order that Baile-Bairead be awarded costs, pre- and post-judgment interest, and attorney fees. Doc. 3 at 6. Belmont asserts two counterclaims: (1) a declaration that the two oil and gas leases are ongoing, valid, and remain in full force and effect; (2) and a cause of action for slander of title. Doc. 5 at 8 (Countercl. ¶ 2). Belmont seeks further relief for both of its counterclaims in the form of costs and attorney fees.

On February 15, 2013, Baile-Bairead filed an Application for Entry of Default Judgment against Magnum according to Rule 55(a) of the Federal Rules of Civil Procedure. *See* doc. 12. Four days later, the Clerk entered default as to Magnum in favor of Baile-Bairead. *See* doc. 14. In April 2013, Baile-Bairead accordingly moved for default judgment against Magnum. Doc. 17. On June 4, 2013, the Court ordered that default be entered on Baile-Bairead's claims against Magnum. Doc. 18. According to the Court's order, Baile-Bairead has been declared the true and lawful owners against Magnum as to the mineral interest in the land. Doc. 18. The Order also had the effect of quieting Baile-Bairead's title to the real estate as to Magnum. Doc. 18.

Baile-Bairead's claims against Belmont, however, have not been resolved. To that end, Baile-Bairead moves for summary judgment upon its Complaint and upon Belmont's counterclaims. Doc. 24. It maintains that the oil and gas leases expired and payment was not tendered to Baile-Bairead before the expiration date. *See* doc. 24. Belmont responds with a cross-motion for summary judgment as to Baile-Bairead's Complaint and Count 1 of Belmont's counterclaims, arguing that it tendered payment to Baile-Bairead and effectively extended the oil and gas leases. *See* doc. 23.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986) (requiring that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts").

## III. DISCUSSION

The pending motions for summary judgment both seek a resolution of the same central issue: whether the oil and gas leases have been forfeited or whether they remain valid. The validity of the leases depends on whether Belmont properly tendered payment to extend the oil and gas leases between the two parties. Belmont contends that it did, while Baile-Bairead argues that the payments were improperly tendered and the leases were forfeited.

### A. Validity of the Leases

Whether the oil and gas leases remain valid hinges on whether Belmont properly extended the primary lease terms. According to their terms, the leases could be extended in two ways: (1) for as long as oil and gas were being produced in paying quantities on the leased property; or (2) for an additional five years if the lessee tendered a bonus consideration payment of $25 per acre on each lease. It is undisputed that no oil and gas were ever produced in paying quantities. The Court must thus determine whether Belmont properly tendered the bonus payments to Baile-Bairead.

#### 1. Validity of the Bonus Payments—Proper Tender of Payment

##### a. Language of the Leases

The parties do not dispute that Ohio contract law governs the interpretation of the oil and gas leases. In interpreting a contract under Ohio law, the Court must "ascertain the intent of the parties." *City of St. Marys v. Auglaize Cnty.*, 115 Ohio St. 3d 387, 390, 875 N.E.2d 561, 566 (Ohio 2007). The law presumes the intent of the parties "to reside in the language they choose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313, 667 N.E.2d 949,

7

952 (Ohio 1996). When interpreting the language of a contract, words and terms are "given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Lo-Med Prescription Servs. v. Eliza Jennings Grp.*, No. 88112, 2007 WL 1290078, at *3–4 (Ohio Ct. App. May 3, 2007) (citing *Shifrin v. Forest City Enters.*, 64 Ohio St. 3d 635, 638, 597 N.E.2d 199, 201 (Ohio 1992)). When the terms of a contract "are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys*, 115 Ohio St. 3d at 390, 875 N.E.2d at 566.

The terms of the lease clearly dictate the proper manner of payment in order to extend their terms. Under the option clause, the "Lessee may exercise its option" to extend the terms of the lease for five more years by making a twenty-five-dollar-per-acre payment, "to be tendered to Lessor in the same manner as provided in Paragraph numbered 4." Doc. 3 at 33 (Ex. D ¶ 19). Paragraph 4 directs that the lessee "shall be obligated to pay or tender . . . an amount . . . to Lessor, or to the credit of Lessor at <u>Lessor[']s address above.</u>" *Id.* at 31 (Ex. D ¶ 4). The first paragraph of the lease lists Bail-Bairead LLC as the lessor, "whose address is 844 Barrett South Rd." *Id.* at 31. In other words, according to the plain language, Belmont had to send payment for the proper per-acre amount to Baile-Bairead at the above address in order to extend the term of each lease.

Based on the evidence presented, the Court finds that Belmont improperly tendered payment to Baile-Bairead under the plain language of the oil and gas leases. Before the primary term of the original lease was set to expire, Magnum, acting on Belmont's behalf, timely sent a letter expressing its desire to extend the lease term with an enclosed check made out to "David C. and Freidel L. Barrett"—not Baile-Bairead. It also sent the letter to the wrong address: to 884—not 844—S. Barrett Rd. In short, Belmont's payment, tendered to Barretts and not Baile-Bairead,

and sent to the wrong address, failed to comply with the leases' plain language addressing extension.

### b. Substantial Performance

Belmont's failure to conform to the plain language of the leases does not end the matter. Belmont contends that its mistakes did not render its efforts for extension invalid. Baile-Bairead disagrees.  Their disagreement depends on whether the doctrine of substantial performance applies here.

A party does not breach a contract if it "substantially performs" the terms of the contract, even if performance does not conform exactly to the plain language of the contract. *Burlington Res. Oil & Gas Co. v. Cox*, 133 Ohio App. 3d 543, 548, 729 N.E.2d 398, 402 (Ohio Ct. App. 1999). The *Burlington* case illustrates this point. There, the lessee timely mailed a rental check to what it thought it were the proper lessors. However, the *Burlington* lessee was not made aware that new owners—and thus new lessors—had taken over in the interim. *Id.* 546–47, 729 N.E.2d at 400–01. The post office returned the lessee's rental check. *Id.* The lessee then mailed a letter to the successor lessors, requesting ratification that they were entitled to the payment. *Id.* Despite the letter, the successor lessors instituted forfeiture proceedings pursuant to Ohio Revised Code 5301.332 because the lessee had not conformed exactly with the lease's requirement to tender payment to the lessor. *Id.* The court held that lease was still valid because "merely nominal, trifling, or technical departures from the terms of a contract are not sufficient to breach it." *Id.* at 549, 729 N.E.2d at 402. It further explained that courts should apply the doctrine of substantial performance to cases in which a party has made an honest, good faith effort to perform the terms of the contract. *Id; see also Ionno v. Glen-Gery Corp.*, 443 N.E.2d 504, 508, 2 Ohio St. 3d 131,

135 (Ohio 1983) ("However, inasmuch as forfeiture is an equitable remedy, a strong showing of a violation of a clear right is required before a court will resort to such an extreme measure."). *Id.*

Pointing to *Burlington* for support, Belmont contends that the leases are valid and in full force because the company substantially performed the terms of the lease. To this end, Belmont maintains that Magnum timely tendered payment to Baile-Bairead and that making the check out to the Barretts instead of Baile-Bairead was a trifling departure from the terms of the contract. Doc. 24 at 6–7. Belmont adopts the same stance regarding Baile-Bairead's emphasis that the check was mailed to the incorrect address, because it is undisputed that Baile-Bairead received the check. *Id.* Baile-Bairead, on the other hand, asserts that the doctrine of substantial performance does not apply. Doc. 28 at 6. It argues that tendering payment to wrong address and to the Barretts as individuals instead of to Baile-Bairead amount to material breach sufficient for forfeiture. *Id.*

The Court finds that there is no genuine issue of material fact on this front, and that Belmont substantially performed its obligations under the leases. Belmont operated in good faith, simply executing the bonus payment in exactly the same manner as the initial bonus payments had been executed. Eight days before its September 22, 2011 deadline, Belmont—by way of Magnum—sent a check addressed to the same people who were paid for the initial lease: David C. Barrett and Friedel L. Barrett. The parties do not dispute this point, nor do they dispute that the Barretts cashed the original checks. Further, the parties do not dispute that Mrs. Barrett received the checks even though they were sent to the wrong address—884 Barrett South Road instead of 844 Barrett South Road. More, there is also no evidence suggesting that Baile-Bairead had previously informed Magnum or Belmont of David C. Barrett's death, meaning Baile-Bairead's forfeiture letter was the first notice that a check tendered to the Barretts was an

improper form of payment. For these reasons, the Court finds that, in timely tendering payment to the Barretts, Belmont substantially performed the terms of the leases. In other words, there is no genuine issue of material fact that the leases are valid and in full force because Belmont properly tendered the extension payment through substantial performance.[1]

Baile-Bairead advances several counterarguments against Belmont's substantial performance, all of which fail to persuade the Court otherwise. First, Baile-Bairead makes much of the fact that Belmont did not act to preserve its interests in the leases. For support, it points out that Magnum, not Belmont, mailed the check to extend the leases; and that Magnum, not Belmont, filed affidavits of extension for the leases with the Washington County Recorder.

Baile-Bairead is factually correct, but its conclusion does not follow. Belmont took over all of Magnum's rights in the leases upon assignment. *Inter Ins. Exch. v. Wagstaff*, 144 Ohio St. 457, 59 N.E.2d 373, 375 (1945) ("[A]n assignee . . . stands in the shoes of the assignor . . . , and succeeds to all the rights and remedies of the latter."). This includes the right to exercise the "contractual privilege" of "[a]n option in a lessee to enjoy an additional term." *Baxter Laundries v. Lucas*, 43 Ohio App. 518, 522, 183 N.E. 538, 540 (Ohio Ct. App. 1932). That Magnum acted to extend the leases on Belmont's behalf does nothing to change Belmont's rights. It makes sense, in fact. If Belmont defaulted on the lease for some reason, then Baile-Bairead could hold Magnum accountable. *See S. Main Akron, Inc. v. Lynn Realty, Inc.*, 106 N.E.2d 325, 330 (Ohio Ct. App. 1951) ("[T]he lessor upon a breach may sue either the lessee or the assignee at his election."). Ohio law also allowed Magnum (as the assignor) to act on behalf of Belmont (the assignee) in extending the term of the lease. *See Baxter*, 43 Ohio App. at 524, 183 N.E. at 540–

---

[1] The Court finds it unnecessary to consider Belmont's argument that Baile-Bairead waived the terms of the lease based on its prior conduct. Belmont substantially performed the terms of the leases in good faith. Thus, the leases are valid regardless of whether Baile-Bairead waived the explicit terms of the lease by accepting the initial checks made out to David C. and Friedel L. Barrett.

41. Further, Magnum and Belmont expressly contemplated that Magnum might so act. According to their assignment agreement, "All rights of the overriding royalty interest . . . *shall also apply to any renewal or extension of a Lease taken or contracted for by or on behalf of ASSIGNEE.*" Doc. 23-4 (caps in original) (emphasis added). In other words, Belmont did act to preserve its rights in the lease in a manner in which the law allows and several of the parties contemplated—through Magnum.

Baile-Bairead also points to two cases for support that do not help its cause. In *Lamar Advantage GP Co. v. Patel,* the Ohio Court of Appeals held that the defendant breached a contract for missing a monthly payment provided for in the contract. *See* 2012 WL 2988819, at *5 (Ohio Ct. App. July 23, 2012). The facts here differ. Belmont did not miss any payments under the contract. And when it attempted to tender a timely extension payment, Baile-Bairead refused to accept a check made out to its members and refused to allow Belmont the chance to cure any deficiencies in payment. Baile-Bairead also points to a case explained above, *Burlington*, that works in Belmont's favor. Even though the lessee there sent its rental check in late, and even though the new lessors refused to accept it, the *Burlington* court held that the lessee exercised good faith although failing to comply with the plain language of the contract. 193 Ohio App. 3d at 548–49, 729 N.E.2d at 401–02. The same holds true here, regardless of the fact that *Burlington*'s facts included a new lessor and those here do not. As the Court has held, Belmont sent a timely extension payment to the same parties paid under the original term of the lease. This overcomes any technical departure from the terms of the contract.

### 2. Baile-Bairead's Additional Arguments that the Leases Are Invalid

Baile-Bairead puts forth three alternative reasons for why the leases are invalid, regardless of whether Belmont properly tendered the bonus payments and extended the leases.

First, Baile-Bairead contends that Belmont did not meet its duty to cure the defective payment in a timely manner. Second, it alleges that the leases were never valid in the first place because they had been improperly executed and acknowledged in 2006. Finally, Baile-Bairead maintains that Belmont violated implied covenants in the oil and gas leases and thus forfeited the leases.

### a. Duty to Cure

The oil and gas leases expressly provided that, in the event of non-payment, the lessee would have thirty days from the lessor's written notice to cure and tender payment. Doc. 24-3 ¶ 8; doc. 24-4 ¶ 8. Further, the leases provided that if the lessor believed the lessee to be in breach of the lease, the lessee would have sixty days from the lessor's written notice to cure the alleged breach. Doc. 24-3 ¶ 15; doc. 24-4 ¶ 15. Baile-Bairead insists that its letters to Belmont, dated September 26, 2011 and October 19, 2011, were a "notice of breach," and that Belmont failed to cure the breach within the thirty- or sixty-day windows. Belmont counters by describing Baile-Bairead's letters as an "unequivocal repudiation" of the oil and gas leases rather than a notice of breach. The language at issue in the September 26, 2011 letter from Baile-Bairead reads:

> In accordance with Ohio Revised Code § 5301.332, this is notice that the purported oil and gas leases between Baile-Bairead LLC ("Lessor") and Magnum Land Services, LLC ("Lessee") dated September 22, 2006, which have allegedly been assigned to Belmont Resources, LLC, have expired and been forfeited. Lessor intends to file an affidavit of expiration and forfeiture with the Washington County (Ohio) Recorder if the purported lessee(s) does(do) not have the purported leases released of record within 30 days of receiving this notice. These purported leases have expired and been forfeited because no drilling has occurred on the premises and there was no extension payment made to the named Lessor, Baile-Bairead LLC, on or before the September 22, 2011 deadline.

Doc. 24-6. Belmont maintains that Baile-Bairead's unequivocal position in the letter was that the leases had been forfeited, not that Belmont had an opportunity to cure the breach.

There is no genuine issue of fact that Belmont substantially complied with the leases' terms by attempting to cure the alleged deficiency. First, as explained, Belmont did not

13

technically comply with the terms of the contract when it attempted to—but did not actually—cure the deficiency in payment. The company sent its payment to Baile-Bairead through Magnum on September 14, 2011 for leases that expired on September 22, 2011; Baile-Bairead responded on September 26 with a clear statement that the "leases have expired and been forfeited" in part because "no extension payment [was] made to the Lessor, Bailre-Baileread LLC, on or before the September 22, 2011 deadline." Doc. 3 at 37 (Ex. G). At minimum, Belmont had thirty days from September 26—until October 26—according to the "Notices" clause to cure this deficiency; at most, it had sixty days from September 26—until November 25—according to the "Breach or Default" clause to cure the deficiency. It tried to cure this deficiency, but it ultimately failed to do so because a new method of payment was not accepted.

Second, Belmont did not fail to comply with the terms of the contract by its own doing. In fact, assuming Belmont breached the contracts by failing to cure, it did so only because Baile-Bairead itself did not comply with the clear terms of the leases. Both of Baile-Bairead's letters clearly state that, according to its position, the leases had expired and been forfeited—in part because there was no extension payment made to the proper party. By taking this position, however, Baile-Bairead expressly violated the terms of the "Notices" clause, which state in plain language that "an error in paying any . . . payment due Lessor *shall not constitute a ground for forfeiture*." Doc. 3 at 28 (Ex. C ¶ 8) (emphasis added). Stated another way, Baile-Bairead was contractually obligated to provide Belmont some length of time—at least thirty days—to cure its deficiency. It violated this obligation by refusing to do so.

Third, and for this reason, Baile-Bairead's response letters and the position it took regarding forfeiture forced the parties' into a situation not covered by the contract: what to do when there is an alleged error in payment for which the lessor refuses to allow a cure. On this

front, "[t]he parties to a contract are required to use good faith to fill the gap of a silent contract." *Burlington*, 133 Ohio App. 3d at 547, 729 N.E.2d at 401. Ohio defines good faith as "a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank*, 75 Ohio St. 3d 433, 443–44, 662 N.E.2d 1074, 1082–83 (Ohio 1996). Belmont's actions in following up on Baile-Bairead's unequivocal refusal to allow cure meet this standard. Belmont responded with a letter—that Baile-Bairead received on October 14—stating that it would re-issue the checks to the LLC "upon confirmation of the lessor's agreement that the leases remain in place." *Id.* at 39 (Ex. H). Because Baile-Bairead's actions in response to Belmont's initial extension payment were "inconsistent" with the terms of the leases, Belmont "did not act in bad faith when it [requested] ratification of the lease." *Burlington*, 133 Ohio App. 3d at 548, 729 N.E.2d at 402. Asking for ratification of the leases and of the attempt to cure, in other words, was reasonable, as a matter of law, under the circumstances.

  *Burlington* again provides support for this conclusion. There, after discovering that a new owner had taken over as the lessor according to the lease, the lessee requested that the new owner of the lease sign a ratification before the lessee sent a rental payment check. The lease at issue did not cover how to handle payments to new lessors. Even though the request for ratification came after the rental-payment due date, the *Burlington* court held that the lessee had substantially performed under the lease; and that, in any event, the request for ratification was made with good faith and thus did not render the lease forfeited. *See id.* at 546–48, 729 N.E.2d at 400–02. Baile-Bairead makes much of the fact that there was no change of real-estate ownership in this case, meaning that *Burlington* does not dictate the outcome here. The Court disagrees. Just

as in *Burlington*, the lessee here substantially complied with the terms of the leases. And just as in *Burlington*, the lessee acted in good faith by requesting ratification (prior to sending a new payment) after the lessor's conduct pushed the parties' interaction into a situation not covered by the lease's terms.

In short, Baile-Bairead did not provide Belmont the opportunity to cure any potential deficiency in payment to extend the leases. Instead, it unequivocally stated that the leases had expired and had been forfeited. Belmont then acted in good faith in requesting ratification, which Baile-Bairead did not provide, prior to resending the extension payment. For these reasons, the Court finds that Belmont did not fail its obligation to cure any deficiencies in payment under the leases.

### b. Initial Execution and Acknowledgment of Leases

Baile-Bairead also contends that the oil and gas leases were never valid in the first place because they were not properly executed or acknowledged in 2006. According to this argument, the execution and notary acknowledgment of the leases were invalid because the Barretts signed them in their individual capacities rather than as the limited liability company. Belmont insists that both executions and acknowledgments of the leases were valid despite this technicality, emphasizing that the Barretts were authorized to act for Baile-Bairead and that enforcing the lease agreements is consistent with the parties' intent.

The Court finds as a matter of law that the Barretts' signatures on the leases do not affect the leases' validity.  Under Ohio law, "[a] limited liability company acts only through its officers, members, or agents." *Marion v. Cendol*, No. 9-12-59, 2013 WL 3832374, at *5 (Ohio Ct. App. July 22, 2013). "Corporations . . . are bound only when the agent is either expressly or impliedly authorized to act for his principal." *Grand Trunk W. R.R. Co. v. H.W. Nelson Co.*, 116

F.2d 823, 834 (6th Cir. 1941). In this case, Baile-Bairead does not argue that the Barretts were not authorized to sign the leases on behalf of Baile-Bairead; the Barretts, after all, were Baile-Bairead's only two members. Thus, because the Barretts were authorized to act on behalf of Baile-Bairead, the Court finds that their signatures do not change the validity of the leases. Baile-Bairead counters that a limited liability company exists as a separate legal entity from any individual owner or owners. *See Disciplinary Counsel v. Kafele*, 108 Ohio St. 3d 283, 287, 843 N.E.2d 169, 173 (Ohio 2006). While true, Ohio law does not require an agreement to specify that the signatories are signing in a representative capacity. *See Jack Schmidt Oldsmobile, Inc. v. Commonwealth Capital Corp.*, No. 93AP-223, 1993 WL 387055, at *5–6 (Ohio Ct. App. Sept. 30, 1993). The real issue, again, concerns whether or not the Barretts were authorized to sign on behalf of Baile-Bairead. Because they were here, and because Ohio law did not require specification that they signed the leases in their representative capacity, the Barretts' signatures do nothing to take away from the validity of the leases.[2]

### c. Violation of Implied Covenants

Baile-Bairead finally contends that the leases are invalid because Magnum and Belmont violated implied covenants attached to the leases. Doc. 24-8 at 13. Under Ohio law, certain covenants are implied in oil and gas leases, including obligations to drill, explore, and reasonably develop the leased land. *Am. Energy Servs. v. Lekan*, 75 Ohio App. 3d 205, 215, 598 N.E.2d 1315, 1321 (Ohio Ct. App. 1992). However, implied covenants cannot exist if they are negated by the specific terms of the lease. *Id.*; *see also Linn v. Wehrle*, 35 Ohio App. 107, 111, 172 N.E. 288, 289 (Ohio 1928) ("The law seems to be well settled in Ohio that there can be no implied covenant in a contract in relation to any matter that is specifically covered by the written terms of

---

[2] Moreover, were the Court to accept this contention, the Barretts would be found to have acted in a fraudulent manner, which this Court assumes they did not, given no evidence to the contrary.

17

the contract itself."). Baile-Bairead contends that there is nothing in the leases to negate these implied covenants. Doc. 24-7 at 13. It further asserts that because Magnum and Belmont had not carried out these implied covenants to develop the oil and gas interest on the land, the leases were forfeited. *Id.* Belmont disagrees, asserting that no implied covenants attach because the leases specifically allow the lessee to hold the leases without production for up to ten years, as long as the lessee pays bonus consideration. Doc. 27 at 7.

Based on the plain language of the leases, the Court finds that there were no implied covenants to develop the land. Several provisions of the leases compel this conclusion. First, the leases provide that they will be in force for "a primary term of 5 years . . . and as long thereafter as oil and gas are produced in paying quantities from the lease premises or from lands pooled with the lease premises, or this Lease is maintained in force pursuant to any of its other provisions." Doc. 24-2 ¶ 2. Second, the Option paragraphs indicate:

> This lease may, at Lessee's option, be extended . . . for an additional primary term of **5** years commencing on the date that the lease would have expired but for the extension. Lessee may exercise its option by paying or tendering to Lessor an extension payment of **$25.00** per acre for the land then covered by the extended lease . . . If Lessee exercises this option, *the primary term of the lease shall be considered to be continuous*, commencing on the date of the lease and continuing from that date to the end of the extended lease term.

*Id.* ¶ 19 (bold in original) (emphasis added). Finally, the "Operations" clauses provide: "This is a PAID-UP LEASE. In consideration of the bonus consideration paid by Lessee, Lessor agrees that Lessee shall not be obligated to commence or continue any operations *during the primary term.*" Doc. 24-2 ¶ 5 (caps in original) (emphasis added); doc. 24-3 ¶ 5 (same).

These provisions expressly indicate that Magnum and Belmont were not obligated to develop the land if they made extension payments to Baile-Bairead. The leases initially provided for a five-year primary lease term, with the option to extend this primary term by five additional

years with an extension payment to Baile-Bairead. According to the "Operations" clause, because initial consideration was paid to Baile-Bairead, Belmont was not obligated to develop the land during the initial five-year term. Further, because Belmont substantially performed the terms of the lease, and attempted to tender bonus consideration to extend the leases, the primary term of each lease was extended for five more years. Thus, Belmont was not required to develop the land during the initial five-year term or during an extension of that primary term. The Court finds that Magnum and Belmont did not breach any implied covenants attached to the leases, and that the leases cannot be invalidated on those grounds.[3]

## B. Belmont's Slander of Title Claim

Baile-Bairead also moves for summary judgment on Belmont's counterclaim for slander of title. *See* doc. 23. Belmont maintains that Baile-Bairead published false, slanderous statements disparaging Belmont's title to the leases with Baile-Bairead's notice of forfeiture recorded in the county recorder's office. Under Ohio law, "[s]lander of title is a tort action" that requires a claimant to prove: "(1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages." *Columbia Gas Transmission Corp. v. Zeigler*, 83 F. App'x 26, 31 (6th Cir. 2003) (citing *Green v. Lemarr*, 139 Ohio App. 3d 414, 430–31, 744 N.E.2d 212, 224 (Ohio Ct. App. 2000)). Because the Court has

---

[3] Because the Court concludes that the leases were ongoing and valid, it finds that Baile-Bairead's institution of forfeiture proceedings under O.R.C. § 5301.332 was improper. Relying on the forfeiture statute, Baile-Bairead asked the Washington County Recorder to mark the two oil and gas leases cancelled. In its motion for summary judgment, Baile-Bairead asks that these proceedings be validated by the court, specifically "that title to the property and interests in the leases be quieted against any claim or interest of the Defendant." The Court finds that Baile-Bairead's actions were improper since the leases were never forfeited. This is consistent with the forfeiture statute's purpose, which is to clear title to leases that have clearly been forfeited, not to attempt to force certain parties to forfeit their interests. *See Blausey v. Stein*, No. OT-78-3, 1978 WL 214959, at *5 (Ohio Ct. App. Dec. 8, 1978), *aff'd*, 400 N.E.2d 408 (Ohio 1980); *see also* Ohio Rev. Code § 5301.332 ("Forfeiture of natural gas and oil land leases; affidavit; notice"). Because the Court finds that the institution of forfeiture proceedings was improper in the first place, it is unnecessary to address Baile-Bairead's argument that neither Magnum nor Belmont properly contested the proceedings under Ohio Revised Code § 5301.332.

already concluded that leases were ongoing and valid, it finds that Belmont has provided enough evidence to satisfy the first two prongs of its slander of title counterclaim: (1) Baile-Bairead published slanderous statements disparaging Belmont's title; and (2) Baile Bairead's statements were false. This leaves the final two elements at issue.

On the third element, when viewed in Belmont's favor, a reasonable jury could find that Baile-Bairead acted with reckless disregard of Belmont's rights in cancelling the leases. Baile-Bairead, through David C. Barrett, Jr., filed an affidavit of forfeiture regarding the leases with the Washington County Recorder on November 9, 2011. This was less than a month after a back-and-forth series of communications with Magnum and Belmont, and less than a month after Belmont directly stated that it did not believe the leases to be forfeited. More, Baile-Bairead knew that Belmont was attempting to extend the leases with an option payment, and that it attempted to do so before the deadline of September 22, 2011. Given these facts, and given the Court's finding that the leases were valid then and remain valid, the Court cannot award summary judgment in favor of Baile-Bairead on the third element of Belmont's slander-of-title claim.

The parties also contest the fourth element of Belmont's slander-of-title claim. Baile-Bairead contends that Belmont has not set forth any evidence of actual or special damages incurred as a result of Baile-Bairead's actions. Belmont counters by arguing that the issue of damages for slander of title in Ohio is uniquely appropriate for resolution at trial.

Under the law in Ohio, "plaintiffs in slander-of-title cases may recover only for 'special pecuniary loss.'" *Green*, 139 Ohio App. 3d at 435, 744 N.E.2d at 227. Ohio courts have held that "special damages" include attorney's fees in defending against claims made "in bad faith, vexatiously, wantonly, obdurately, . . . for oppressive reasons, or in cases of torts involving

malice." *Id.* at 435, 744 N.E.2d at 228. Here, as explained, a reasonable jury could find that Baile-Bairead acted with malice in disparaging Belmont's title. *See Childers v. Commerce Mortg. Invs.*, 63 Ohio App. 3d 389, 392, 579 N.E.2d 219, 221 (Ohio Ct. App. 1989) (noting that the "malice shown" for a slander-of-title claim "need not be that of a personal hatred, and an act will be deemed malicious if made in reckless or wanton disregard of the rights of another"). This would then open the door for attorney's fees that, drawing all justifiable inferences in its favor, Belmont has incurred in this case. Thus, the arguments, law, and findings are not "so one-sided that one party must prevail as a matter of law" at this point. *Liberty Lobby*, 477 U.S. at 252. For these reasons, Baile-Bairead's motion for summary judgment on Belmont's slander-of-title claim is denied.

## V. CONCLUSION

Based on the foregoing, Belmont's cross-motion for summary judgment as to Baile-Bairead's Complaint and Count 1 of Belmont's counterclaims is **GRANTED**. Doc. 24. The Court concludes that there are still issues of material fact regarding Count 2 of Belmont's counterclaims. Thus, Baile-Bairead's motion for summary judgment as to its Complaint and Counts 1 and 2 of Belmont's counterclaims is **DENIED**. Doc. 23.

**IT IS SO ORDERED.**

_5-13-2014_
**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

21